# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| MTI, INC., formerly Midwest Towers, Inc., | ) <br> ) <br> ) |
| Plaintiff, | ) <br> ) |
| v. | )    Case No. CIV-15-716-R <br> ) |
| EMPLOYERS INSURANCE COMPANY OF WAUSAU, | ) <br> ) <br> ) |
| Defendant. | ) |

## ORDER

Defendant has filed a Motion for Summary Judgment (Doc. No. 17) and Plaintiff has responded in opposition thereto (Doc. No. 24). Defendant also filed a Reply in support of its position. (Doc. No. 17). Having considered the parties' submissions, the Court finds as follows.

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Where, as here, the moving party has the burden of proof, a more stringent summary judgment standard applies. Thus, if the moving party bears the burden of proof, to obtain summary judgment, it cannot force the nonmoving party to come forward with "specific facts showing there [is] a genuine issue for trial" merely by pointing to parts of the record that it believes illustrate the absence of a genuine issue of material fact. *Mudrick v. Cross Services, Inc.*, 200 Fed.Appx. 338, 340 (5th Cir.2006) (citing *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Rather, it must establish, as a matter of

law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case. *Id.*. In performing the summary judgment analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party. *Id*.

In May 2011, MTI completed an annual inspection of a cooling tower operated by Western Farmers Electrical Cooperative. As a result of its inspection, MTI submitted a bid to Western Farmers to perform certain maintenance on the Cooling Tower, to undertake repairs identified as necessary during the inspection. The April 28, 2011 Scope of Work stated:

> <u>Unit I Tower Anchors</u>
> Throughout the entire basin, install new 304 SS anchor castings. Included will be 304SS anchor bolts and Hilti anchor adhesive.
> <u>Unit I Louvers</u>
> On four (4) cells, remove existing louvers and install a (3) row louver system. New louvers will consist of 12oz. 4.2" corrugated FRP panels supported on 2"x4" Douglas Fir supports. Included will be new polypropylene support arms. Also included will be all necessary 304 stainless steel hardware.

The cooling tower's original construction was a wooden frame with bolted connections including vertical columns and diagonal braces; it measured 50 feet wide, by 150 feet long by 70 feet tall. The tower was anchored to a concrete foundation of a sump pit by 64 anchor bolts.

On May 23, 2011, as part of its work on the cooling tower, Plaintiff MTI removed the sixty-four anchor bolts from the base, breaking them to pieces to extricate them from the concrete. At that time MTI did not have access to the gun necessary to insert the epoxy adhesive identified in the Scope of Work into the concrete, which was intended to hold the

replacement bolts in place. As a result, no new bolts were installed on May 23, 2011. On May 24, 2011, still lacking access to the tools, MTI continued work without replacing the bolts. On May 25, 2011, MTI personnel arrived at the facility and discovered the tower leaning, having been damaged by high winds overnight. MTI employees used forklifts to brace the tower to prevent a total collapse of the structure. Plaintiff admits that the wind caused damage to the cooling tower because it had removed the bolts and no temporary bracing was used to ensure stability of the structure. Farmers Electric concluded the damage to the cooling tower was so extensive that replacing the unit was the better course than attempting repair.[1] MTI paid Farmers Electric $350,000 to settle the Cooperative's claims against MTI. MTI seeks to recoup this amount from Defendant Wausau pursuant to a policy of insurance in place on the date of the accident.

Defendant seeks summary judgment on Plaintiff's sole claim, breach of contract, asserting that under exclusion j(5), j(6), or both, there is no coverage. Plaintiff contends Defendant has not met its burden of establishing that either exclusion applies, and therefore, it is not entitled to summary judgment. Plaintiff further contends the Court should find the exclusions ambiguous and construe them against Defendant, the insurer.

This is a diversity case requiring the Court to construe disputed terms of an insurance policy as required by state law. *See Zurich American Ins. Co. v. O'Hara Reg'l Ctr. for Rehabilitation*, 529 F.3d 916, 920 (10th Cir. 2008). The parties do not dispute that Oklahoma substantive law governs the interpretation of the Policy. Under Oklahoma law,

---

[1] Western Farmer's insurer, Factory Mutual, paid $1,138,357.64, the cost of replacement minus the $350,000 paid by MTI.

3

an insurance contract should be construed according to the terms set out within the four corners of the document. *First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1173 (10th Cir. 2005). "The construction of a policy should be natural and reasonable, viewed in the light of common sense. The result should not be absurd." *Redcorn v. State Farm Fire & Casualty Co.*, 55 P.3d 1017, 1019 (Okla.2002) (citation omitted). If the terms of the contract are "unambiguous, clear and consistent, they are to be accepted in their ordinary sense and enforced to carry out the expressed intention of the parties." *Roads West, Inc. v. Austin*, 91 P.3d 81, 88 (Okla. Civ. App. 2004). The Court should not create an ambiguity in a policy by "using a forced or strained construction, by taking a provision out of context, or by narrowly focusing on a provision." *Wynn v. Avemco Ins. Co.*, 963 P.2d 572, 575 (Okla. 1998). A policy term will be considered ambiguous only if it is susceptible to more than one reasonable interpretation. *Max True Plastering Co. v. U.S. Fidelity & Guar. Co.*, 912 P.2d 861, 869 (Okla. 1996). Additionally, "[a]n insurance contract is considered a contract of adhesion in Oklahoma, and is construed in favor of the insured when ambiguity remains after applying the rules of construction." *Mansur v. PFL Life Ins. Co.*, 589 F.3d 1315, 1319 (10th Cir.2009) (citing *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372, 376 (Okla.1991)). "The interpretation of an insurance contract and whether it is ambiguous is a matter of law for the Court to determine and resolve accordingly." *Dodson*, 812 P.2d at 376. Finally, a basic tenet of insurance law provides that the insured has the burden of showing a covered loss, while the insurer has the burden of showing that a loss falls within an exclusionary clause of the policy." *See McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992); *Pitman v. Blue Cross*

& *Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000); *Fehring v. Universal Fidelity Life Ins. Co.*, 721 P.2d 796, 799 (Okla.1986) (holding that insurer failed to sustain burden of proving loss came within scope of exclusionary clause).

Defendant's motion is premised on the applicability of two exclusions contained in the Policy. In footnote 3 at pages 15-16 of its brief in support of the motion, Defendant makes a half-hearted attempt at challenging the existence of coverage by arguing that Plaintiff has not established an "occurrence" as required to give rise to coverage because MTI's negligence caused the loss. The Court will not consider this argument, limiting its consideration to the issue of whether, assuming an occurrence and coverage under the Policy, Wausau has met its burden of establishing no genuine issues of material fact and the applicability of an exclusion under either provision j(5) or j(6) of the Policy.[2]

The Policy at issue herein provides that insurer will "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." Policy, Section (I)(A)(1)(a). The Policy applies only if the "property damage" is "caused by an 'occurrence' that takes place in the 'coverage territory.'" *Id.*, Section I, (b)(1). The Policy contains certain exclusions, including the following:

> This insurance does not apply to: . . .
> j. **Damage to Property**
> "Property damage" to: . . .
> (5) That particular part of real property on which you . . . are performing operations, if the "property damage" arises out of those operations; or

---

[2] The Court's decision in this regard is premised on the fact that no Oklahoma state cases define the term "occurrence" and that addressing the issue of whether coverage exists in a footnote is insufficient.

5

> (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
> Exclusion j(6) does not apply to "property damage" included in the "products completed operations hazard."

*Id.* Section (I)(A)(2)(j)(5), (6). These exclusions are generally referred to as "business risk" or "faulty workmanship" exclusions and are often cited together. Defendant correctly notes that exclusions j(5) and j(6) are designed to prevent recovery by an insured for faulty workmanship**.** The question presented herein is whether finding coverage for the cost of replacing Tower One would transform the policy into something akin to a performance bond. This requires the Court to assess the phrase "particular part," which is not defined in the Policy. Its definition has plagued both federal and state courts, with differing results.

MTI's interpretation of the phrase "particular part" contemplates the narrowest interpretation of the phrase, arguing that damage to Tower One beyond the brackets was sustained to property other than the "particular part of real property" upon which MTI was working, and thus exclusions j(5) and j(6) do not exclude coverage. Conversely, Defendant, advocates for a broad interpretation of the phrase. Wausau asserts that MTI was engaged to perform operations on various parts of Tower One, and because the damage was to the entire structure thereof, this was the "particular part" of the real property. Specifically, because MTI removed bolts from the base of the structure and because its contract with the Co-op called for more than merely removing and replacing the bolts, but also called for

6

replacement of some of the tower's structural supports and louvers, all damage to the tower is excluded.³

There is no Oklahoma state court authority addressing the term "particular part" in the context of the j(5) or j(6) exclusion and accordingly, the Court's role is to predict the outcome of this case if the issues were presented to the Oklahoma Supreme Court. *See, e.g., Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1174 (10th Cir.2008). There is abundant state and federal court litigation addressing the j(5) and j(6) exclusions, with inconsistent results. *See Roaring Lion v. Nautilus Ins. Co.*, 2011 WL 3956132, 7 (D.Mont. July 15, 2011)("Courts from other jurisdictions are split when it comes to the meaning of the phrase 'that particular part' as it appears in identical commercial general liability policy exclusions."). The differing outcomes make it difficult to discern a trend regarding the definition of "particular part" or how broadly or narrowly the term is defined. *Compare E.& R Rubalcava Const, Inc. v. Burlington Ins. Co.*, 147 F.Supp.2d 523 (N.D. Tex. 2000)(exclusion j(6) "only applies to the cost of repair to the foundation itself, not to the cost of repair of any other damage to the homes in issue") *and Fortney v. Weygandt, Inc. v. American Mfrs. Mut. Ins. Co.*, 595 F.3d 308 (6th Cir. 2010)(following Fifth Circuit precedent and concluding "that particular part" is so

---

³ In support of application of the exclusions, Defendant, citing *Dodson v. St. Paul Ins. Co.*, 812 P.2d 372 (Okla. 1991), argues that a commercial general liability policy does not provide coverage for a contractor's faulty work. *Dodson*, however, does not drive the outcome of the instant litigation. Although the court therein concluded the roof was excluded from coverage because the insured had been working thereon, the insurer had paid for the interior damage to the building caused by the faulty roof. *See id* at 373 ("Insurer subsequently admitted liability for the school building's interior property damage caused by the roofing defect, but insisted that the policy did not cover the subcontractor's defective workmanship or materials.") Accordingly, the issue of what particular part was not called into question in the same manner as raised by this action. Furthermore, although the court considered exclusions to coverage, it was not called upon to assess exclusions using the same language as those upon which Defendant relies.

restrictive so as to make clear that it applies only to building parts on which defective work was performed as opposed to the building generally) *with Jet Line Servs., Inc. v. American Employers Ins. Co.,* 404 Mass. 706, 707 (1989)(concluding that "particular part" referred to the entire tank and and not just to the bottom thereof under exclusion j(5)) *and Spencer & Company, LLC v. Essex Ins. Co.*, 2009 WL 2231222 (Mass. Super. 2009)(applying exclusions j(5) and j(6) where the insured was retained to build the dwelling and, therefore, the entire dwelling was under the insured's control). Additionally, some courts have resolved the issue by concluding that the term "particular part" is ambiguous. *See Cogswell Farm Condo. Ass'n. v. Tower Group, Inc.*, 110 A.3d 822, 827 (N.H. 2015)(Finding "that exclusion J(6) is subject to more than one reasonable interpretation, and one of those interpretations provides coverage, an ambiguity exists that will be construed against the respondents."); *Bituminous Cas. Corp. v. Kenway Contracting, Inc.*, 240 S.W.3d 633, 641 (Ky. 2007)("Given that the policy [j(5)]contains terms that are not defined, and given that each party has suggested a reasonable interpretation in light of the plain meaning of the words used, we conclude the policy is ambiguous" and making a similar finding with regard to the j(6) exclusion).

The Court herein declines to adopt Plaintiff's position that exclusions j(5) and j(6) are ambiguous and therefore, that Defendant cannot prevail on summary judgment. Rather, the Court finds that the plain language of the Policy, combined with the scope of the contract at issue and the nature of the work involved, support Defendant's position that Tower One was the "particular part" of the real property upon which MTI was performing operations and therefore the damage to the tower is excluded from coverage.

In *Erie Exchange v. Pugh*, 1999 WL 812292 (Ohio App. 2 Dist. Oct. 8, 1999), the insured was a contractor hired to renovate a basement and construct an addition to a home. An employee was working in the basement when the first floor collapsed, the result of undermining the foundation footers without shoring up the residence or footers. *Id.* at *2. The court concluded, "since 'that particular part of the real property upon which operations are being performed' involved the foundation which supported the entire residence, and since such operations set off the reaction which caused all of the subsequent damage, the appellant's argument must give way to the exclusionary language of Erie's policy. Indeed, the isolation of the foundation as the only place where faulty operations were being performed when the house fell down, and the assessment of damages accordingly, could lead to completely illogical results." *Id.*[4] Similar results have been reached by courts considering the inherent business risk of moving or elevating a home to fix its foundation, resulting in the unintentional damage or destruction of the home. *See Lafeyette Ins. Co. v. Peerboom*, 813 F.Supp.2d 823 (S.D.Miss. 2011)(Where insured "The risk that the house would fall and sustain damage in the process of Absolute's house-raising operation and sustain damage as a result was not merely a fortuitous event but a business risk which falls squarely within exclusions j(5) and j(6)).[5]

---

[4] The trial and appellate court concluded that destruction of the addition after collapse of the main house was not governed by the exclusionary provisions of the policy. *Id.*

[5] MTI argues in footnote 21 of its Response to the Motion for Summary Judgment that exclusion j.(5) applies only to property damage that occurred while the insured is actually working on the particular part. MTI does not directly assert that because Tower One shifted at night while no one was present on site and actually working that j.(5) does not apply, although this position was made clear during pre-litigation letters between counsel. To the extent Plaintiff is attempting to rely on the absence of any activity at the time of the wind damage, the Court rejects such argument. As noted by the court in *American Ins. Group. v. Urban*, 2001 WL 1723734 (D.Kan. May 23, 2001):
> This is not to say that the insured, or one acting directly or indirectly on behalf of the insured, must be physically present and actually performing work at the time the property damage occurs, but only

In *Spirtas Co. v. Nautilus Ins. Co.*, 715 F.3d 667 (8th Cir. 2013), the court considered the application of exclusions (j)(5) and (j)(6) with regard to the cost of removing sections of a bridge from the river below when the demolition of the bridge did not go according to plan. Following unsuccessful detonations portions of the bridge fell into the river and part remained connected. The connected portion was removed and lowered into the river where divers had to cut the pieces of the bridge to remove them. The insured argued that the river was not the "particular part of real property" while the insurer argued both the bridge and the river fell within the exclusion. The court agreed with the insurer, because the original plan was for the bridge to fall into the river, but not in the same manner as actually occurred. "Here, dropping the bridge span into the river was an integral part of the demolition. Therefore, both the bridge and river were the "particular part of real property" on which Spirtas's operations occurred." *Id.* at 672. The court concluded both exclusion (j)(5) and (j)(6) applied, because the restoration of the river to navigability fell within the parameters of restoring or repairing that particular part upon which the insured was working.

In *American Mercury Ins. Group v. Urban*, 2001 WL 1723734 (D.Kan. May 23, 2001), the court considered exclusions j(5) and j(6) with regard to the insured's negligent construction work at a grain-handling facility, including the concrete pad. The wet bin was partially filled with grain when it began to tilt as a result of the settling of the concrete pad

---

that, at the time of the property damage, the insured must be in possession of and occupy the site because the contract or subcontract has not yet been complete. *See e.g., Gar-Tex Construction Co. v. Employers Casualty Co.*, 771 S.W.2d 639, 642 (Tex.Ct.App. 1989)(where court concluded isured was performing operations when the property damage occurred even though insured and those acting on behalf of insured were not physically working during the weekend when the damage occurred).

*Id.* at *8, n. 6.

upon which it was sitting. The owner of the facility argued that the tilting of the bin damaged the entire grain handling facility.

> Even if the Court were to infer physical damage to "other property," Kansas law supports a finding that under the terms of the contract that "particular part" of the real property upon which MGC performed work actually encompasses the "grain-handling facility" as a whole.

*Id.* at *8. The court ultimately determined that j(5) did not apply because the insured was no longer working on the property when the property damage occurred and j(6) would preclude any damages but for the products-completed operations hazard exception. In *Utility Maintenance Contractors, Inc. v. West American Ins. Co.*, 19 Kan.App.2d 229 (1994), the court considered the same exclusions with regard to operations performed in unclogging a sewer. The blockage was 115 feet from the manhole and required insertion of a jet water root cutter, after which water flowed through the pipe. However, even after the water flow was reinstated, damage was discovered to 160 feet of pipe, apparently the result of a bolt breaking off the root cutter. In considering exclusions j(5), the court concluded that the sole manner to treat the clog was by inserting the root cutter at the manhole, and thus the "sewer pipe and clog point should be viewed as whole." *Id.* at *234. The court concluded with regard to the damaged portion beyond the clog that application of the exclusion was dependent "upon a factual showing on remand that it was the usual and necessary practice under similar circumstances to use the cutter beyond the initial point where the clog is first noted." *Id.* Similarly, in *Goldsberry Operating Co., Inc v. Cassity*, 367 So.2d 133 (La.App. 1979), the insured was to perforate a well with an explosive gun 8,000 feet below the surface. The gun exploded at 6,900 feet, causing damage. The court

11

concluded that the "particular part," as used in a similar but not identical exclusion to those at issue herein, included the portion of the well between the surface and the contracted depth of 8,000 feet. "We are called upon to construe the . . . provision to determine whether Cassity was performing its operation solely upon the ten feet Cassity intended to perforate at the 8,000 foot level (as Cassity contends) or whether Cassity was performing its operation upon the tubing (as Aetna contends)." *Id.* at 134. The court sided with Aetna, concluding that the particular part of the property was the entire part of the well where the line traversed and through which electricity would have passed to detonate the gun, had it reached 8,000 feet, thereby excluding coverage. *Id.* at 135. The *Cassity* court cited *Vinsant Elec. Contractors v. Aetna Casualty and Surety*, 530 S.W.2d 76, (Tenn. 1975), in support of its position. There, a contractor shorted and destroyed an entire switchboard while installing two circuit breakers. The court characterized the switchboard as "a unit composed of many interrelated and interdependent parts, a complex, multi-component collection of electric wires, switches, breakers, conductors, . . . etc. . . . The property being worked upon . . . was therefore a single item of property which, though composed of many parts, was clearly a unit of property within itself, self contained and a single item." *Id.* at 76-77.

Here, the fact that MTI was engaged in an activity that removed the tower from its base in the sump pit and the scope of work for which MTI was engaged, that is to replace all anchor bolts as well as to conduct work on the louvered walls of Tower One, leads the Court to conclude that "the particular part" of the property on which MTI was performing

operations was the entire Tower One structure and therefore, under exclusion j(5), coverage is excluded.

The Court further finds that the j(6) exclusion applies to exclude the loss from coverage. In *Welfie, Inc. v. Motorist Ins. Group*, 207 WL 1174652 (Ohio App. April 23, 2007), the court affirmed summary judgment to the insurer where insured, a subcontractor hired to remove asphalt from a bridge for repaving, cut into the concrete deck, requiring its repair. The court concluded that the "particular part" of the real property on which the insured was performing operations was the bridge deck, and that it damaged the bridge deck in those operations. Here, Tower One is the particular part of property that was damaged by MTI's work thereon, specifically removal of the bolts without either immediately replacing them or shoring up the structure to avoid shifting due to the wind. Similarly, in *LISN, Inc. v. Commercial Union Ins. Cos.*, 615 N.E.2d 650 (Ohio App. 1992), the court concluded that j(6) excluded coverage when, in the course of removing nonfunctional/abandoned telephone switching cables, the insured accidentally cut the live cable. The insurer denied coverage for the cost of repairing the replacing the live line, citing exclusion j(6).

> LISN's work at NYNEX was to mine the obsolete cable without disturbing the functioning cable and to identify and protect the functioning cable. . . . Sections 2j(g) and VI(A)(2)(2)(iii) exclude coverage under the insurance policy for property damage that must be repaired or replaced because LISN's work was incorrectly performed on the property. When LISN failed to protect the functioning cable and cut the functioning cable, LISN's work was incorrectly performed and the damage done to the functioning cable was excluded under the plain and unambiguous provisions. . . .

*Id.* at 630. Similarly, in E.*H. Spencer & Co., LLC v. Essex Ins. Co.*, No. 0600135, 2009 WL 2231222, at *3 (Mass. Super. May 27, 2009), aff'd, 79 Mass. App. Ct. 1109, 944 N.E.2d 1094 (2011), the court concluded that because the contractor/insured was hired to build the dwelling, that exclusions j(5) and j(6) relieved the insurer of its obligation to defend because the entire structure was under the insured's command.

The Eastern District of Missouri recently addressed a case similar to this and concluded that exclusion j(6) effectively excluded coverage for damage to a transformer. In the course of preparing a transformer for relocation by removing internally and externally attached bushings, a bushing was lifted by a crane without the realization that one of its bolts had not been removed. "A final thrust from the crane forcibly yanked the bushing from the transformer, causing the bushing in turn to yank the attached lead cable from the winding coil, damaging the coil and rendering the transformer useless and beyond repair. The bushing itself was not damaged." *Electric Power Systems, Int'l, Inc. v. Zurich American Ins. Co.*, 2016 WL 4990498, *3 (E.D.Mo. Sept. 19, 2016). Relying on exclusion j(6) the court concluded the insurer was entitled to summary judgment.

> When EPS worked to remove the bushing from the transformer, it performed work on the coil's lead cable by removing the bolts that attached the lead to the bushing. It was EPS's action in failing to detach the lead from the bushing that caused the lead to be pulled from the coil, which is the damage for which EPS claims coverage. While "detach lead cable from bushing" was not specifically included in its contract with LGE, EPS's work to detach the lead was an integral part in removing the bushing from the transformer. Indeed, disconnecting the lead was part and parcel of this work—the bushing simply could not have been removed if EPS's work on the lead was not properly performed. Therefore, the coil's lead cable was a "particular part" of the property on which EPS worked. *See Spirtas Co. v. Nautilus Ins. Co.*, 715 F.3d 667, 672 (8th Cir. 2013) (applying Missouri law); *Brake Landscaping & Lawncare, Inc. v. Hawkeye–Sec. Ins. Co.*, 625 F.3d 1019, 1023 (8th Cir.

14

> 2010) (applying Missouri law). Since the damage to the coil was caused by EPS's incorrect performance of its work in detaching the coil's lead cable from the bushing, Exclusion j(6) applies and there is no coverage for the claimed damage.

*Id.* at 4. The Court concurs with these authorities and finds them persuasive in support of Defendant's contention that it is not in breach of the Policy because it has refused to indemnify MTI.

As a result of Defendant's defective work, that is removal of the bolts without re-adhering them to the sump pit or shoring up the structure, required replacement of the entirety of Tower One, the "particular part of real property" upon which MTI was performing operations. As such, exclusion j(6) applies and Defendant is not required to indemnify Plaintiff for the amounts it paid to the Co-op for the damage. Furthermore, exclusion j(5) applies as well, MTI was performing operations on Tower One on the particular part of real property and the property damage arose from these operations. As such, Defendant is entitled to summary judgment having established as a matter of law that exclusions j(5) and j(6) apply herein to remove MTI's claim from coverage. As such, Defendant's motion for summary judgment is hereby GRANTED.

IT IS SO ORDERED this 25th day of August 2017.

_David L. Russell_
DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE